UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------
| COSMOPOLITAN INTERIOR NY     |
| CORPORATION,                 |
|                              |           19-cv-2669 (JSR)
|            Plaintiff,        |
|                              |           MEMORANDUM ORDER
|       -v-                    |
|                              |
| DISTRICT COUNCIL 9           |
| INTERNATIONAL UNION OF       |
| PAINTERS AND ALLIED TRADES,  |
|                              |
|            Defendant.        |
------------------------------
```

JED S. RAKOFF, U.S.D.J.:

    Four days into the bench trial of this case, after the Plaintiff
had been fully heard on the issue of whether Defendant District Council
9 International Union of Painters and Allied Trades ("DC 9") had
unlawfully threatened certain unionized painting contractors in
connection with a primary labor dispute between DC 9 and Plaintiff
Cosmopolitan Interior NY Corp. ("Cosmopolitan Interior"), DC 9 moved
under Fed. R. Civ. P. 52(c) for judgment on partial findings. Following
argument from both parties, the Court issued an oral ruling, granting
in part and denying in part DC 9's motion for judgment on certain
issues but without issuing a final judgment as to any of Cosmopolitan
Interior's claims. See Tr. 473.

    For the benefit of the parties -- who are assumed to be familiar
with the claims, procedural history, trial record, and factual
background -- the Court now issues this written order to amplify its
oral judgment, which remains unchanged.

## I.   Legal Standard

During a nonjury trial, Fed. R. Civ. P. 52(c) permits the Court to enter judgment on any issue after a party has been fully heard on that issue. If entering judgment, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); see id. 52(c). Unlike at summary judgment, Rule 52(c) authorizes the court to make credibility determinations and resolve disputed issues of fact, applying "the same standard of proof and weigh[ing] the evidence as it would at the conclusion of the trial." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 272 (3d Cir. 2010). Moreover, "the district court is not required to draw any inferences in favor of the non-moving party." Ritchie v. United States, 451 F.3d 1019, 1023 (9th Cir. 2006). The Rule 52(c) standard stands in contrast to the standard applicable to a motion under Rule 50(a) for judgment as a matter of law, for which "the evidence must be viewed in the light most favorable to, and drawing all reasonable inferences in favor of, [the non-moving party]." Burger v. New York Inst. of Tech., 94 F.3d 830, 835 (2d Cir. 1996). However, Rule 50 is expressly limited to jury trials, so it is inapplicable in this bench trial, in which the Court is the sole factfinder. See Fed. R. Civ. P. 50(a)(1).

Rule 52(c) does not require that "the court wait until [a] party rests its case in chief to enter judgment [against that party] pursuant to Rule 52(c)." EBC, Inc., 618 F.3d at 272. Here, the Court granted DC 9 leave to move under Rule 52(c) after Cosmopolitan Interior finished putting on all witnesses in its direct case, other than two

DC 9 employees whom Cosmopolitan Interior intended to call as adverse witnesses (and whom the defense intended to call as well). However, during argument, counsel for Cosmopolitan Interior was permitted to make an offer of proof as to the testimony it expected to elicit from these DC 9 witnesses. The Court therefore assumed, for the purpose of this motion, the truth of those additional facts proffered by Plaintiff's counsel. The Court further drew all reasonable inferences in Cosmopolitan Interior's favor on anything related to the points raised in plaintiff counsel's offer of proof. However, none of the points raised in the offer of proof effected the Court's findings of fact relevant to deciding whether DC 9 unlawfully threatened the two painting contractors with respect to whom the Court grants judgment.

## II.   **Findings of Fact**

The Court will set forth its complete findings of fact at the conclusion of the trial. However, for the purpose of this order, the Court finds the following facts:

1.   Cosmopolitan Interior is a construction contractor that was founded in 2013 and has performed painting and wallpapering. Cosmopolitan Interior is owned by Moishe Gold. Trial Transcript ("Tr.") at 132.

2.   DC 9 is a union representing painters, wallpaper installers, and drywall tapers, among other trades. Its President is John Drew. See Plaintiff's Exhibit ("Pl. Ex.") 4.

3.   DC 9 has entered into a collective bargaining agreement ("CBA") with certain painting contractors that, inter alia, sets "area

3

standard" wages and benefits. See, e.g., Pl. Ex. 4. Painting contractors that are party to the CBA must pay at least the area standard wages and benefits to their workers. Under the CBA, before starting any job, a signatory contractor must file paperwork with DC 9 "registering" the jobsite, and it must register with DC 9 any overtime its painters work. The contractor must further submit payroll information and make contributions to DC 9 benefit funds. Tr. 61-62.

4.   On certain construction sites in New York City, customers and general contractors require that all subcontractors employ union labor and pay area standard wages for each unionized trade. These jobs are referred to as "union jobs" or "union work." See, e.g., Tr. 224; 248-249.

5.   Cosmopolitan Interior was primarily a sales company that would prepare estimates and bid on interior painting projects in and around New York City. Cosmopolitan Interior was not a signatory to the DC 9 CBA. Therefore, Cosmopolitan Interior could not supply its own union labor for union jobs. Tr. 169-170.

6.   When Cosmopolitan Interior was selected for a non-union (i.e., "open shop") job, it would subcontract the work to a non-union painting company. Cosmopolitan Interior subcontracted much of its non-union work to JLM Decorating, Inc., a company that was also owned by Gold and which operates out of the same office space as Cosmopolitan Interior at 111 John Street. Tr. 128, 283, 313, 501.

7.   Companies that are not signatories to the DC 9 CBA may bid for union work, but the DC 9 CBA requires that the non-union company

must engage a subcontractor that is a signatory to the DC 9 CBA. See,
e.g., Tr. 248.

8.   Under DC 9's interpretation of the CBA, a union subcontractor
may supply labor to a non-union contractor, provided that the
subcontractor has a contractual relationship with the client
contractor and, inter alia, supervises the painters. Tr. 70-71.

9.   From 2013 until some point in 2018, Cosmopolitan Interior,
when selected for union work, deployed union labor through the auspices
of another company, Cosmopolitan Interiors USA Corp. ("Cosmopolitan
USA"), which was a signatory to the DC 9 CBA until the summer of 2018.
Cosmopolitan USA was owned by Joel Friedman, and, for at least some
portion of the period from 2013 through 2018, Cosmopolitan USA and
Cosmopolitan Interior occupied the same office space at 111 John Street
in Manhattan. Cosmopolitan Interior also supplied the materials,
supervision, and project management for union jobs for which
Cosmopolitan USA registered the jobs with DC 9 and paid the workers.
Tr. 306-309.

10.  At some point before autumn 2018, following several disputes
with DC 9 that resulted in DC 9 filing grievances with a Joint Trade
Board arbitral panel, Friedman informed Gold that Cosmopolitan USA
would no longer operate. Therefore, Cosmopolitan Interior lost its
primary source of subcontracted union labor. Tr. 142, 177-178.

11.  In late 2018, after Cosmopolitan USA was no longer operating,
Gold approached other companies that were signatories to the DC 9 CBA,

seeking a new subcontracting relationship to enable him to deploy union labor to conduct business union jobsites. Tr. 178.

12.  Among the companies Gold approached was Par Wall Finishing, Inc. ("Par Wall"), a drywall taping subcontractor owned by Brian Gordon. Par Wall was a signatory to the DC 9 CBA and employed union drywall tapers, but it did not employ any painters. Tr. 60-61, 82. Starting in or about August 2018, Gold had a series of conversations with Gordon about Par Wall acting as the "paymaster" for certain union jobs that Cosmopolitan Interior either had in progress or for which Cosmopolitan Interior's bid had already been selected. Tr. 63-64, 82-83; Ex. 1. Gordon agreed to this paymaster relationship as a favor to Gold, who had helped Gordon obtain financing some years before. Par Wall made little, if any, profit from this arrangement. Tr. 83-84.

13.  In this "paymaster" arrangement, Par Wall would register each Cosmopolitan Interior jobsite with DC 9. See, e.g., Ex. 2. Cosmopolitan Interior would then supply union painters, equipment, and materials to the jobsite. Cosmopolitan Interior staff would supervise the painters and provide Par Wall with information on the workers and their hours, which Par Wall would report to DC 9 and use to calculate and pay the workers' wages and benefit contributions in compliance with area standards. Tr. 65, 68, 71, 84-85. Cosmopolitan Interior would then reimburse Par Wall for the labor costs, plus an additional fee of approximately 5-10%, which would cover certain overhead expenses. Tr. 85, 90-91.

14.   After Gordon spoke to Gold but before Gordon began working for Cosmopolitan Interior, Gordon spoke with Drew about whether it would raise any concerns for DC 9 if Par Wall acted as a subcontractor for Cosmopolitan Interior on the in-progress and already awarded union jobs. Drew told Gordon that the CBA permitted Par Wall to work with Cosmopolitan Interior under the terms established by the CBA's subcontracting provisions. Tr. 66-68.

15.   Par Wall acted as paymaster for Cosmopolitan Interior on approximately 15 union jobsites in or about December 2018 and January 2019. Tr. 64.

16.   Among the union jobs for which Par Wall acted as paymaster was a project at 1 Soho Square, 161 Avenue of the Americas, in the offices of the insurance company Aetna. Cosmopolitan Interior had been hired as a subcontractor to do painting and install wall coverings for this Aetna job by the general contractor J.T. Magen, which only hired Cosmopolitan Interior for union work. Tr. 73.

17.   During the time when Par Wall was acting as paymaster for the Aetna project, in or about January 2019, Gordon and Drew spoke again. Drew told Gordon that DC 9 construed the CBA to prohibit the paymaster relationship, in which Par Wall was working on jobsites without a contract with the general contractor or the subcontractor, Cosmopolitan Interior. Tr. 71. In this conversation, Drew intimated that DC 9 would file a grievance under the CBA against Par Wall if it continued acting as Cosmopolitan Interior's paymaster. Tr. 70-71. However, Drew reiterated to Gordon that the DC 9 CBA permitted Par

Wall to establish a formal subcontracting relationship with Cosmopolitan Interior and provide union painters to Cosmopolitan Interior on either the Aetna job or any other union job. Tr. 74. Drew never threatened Gordon or Par Wall or suggested that there would be a work stoppage if Par Wall continued doing business with Cosmopolitan Interior. Tr. 86-87.

18.   Shortly after this conversation, Gordon pulled the painters off the Aetna job and terminated Par Wall's paymaster relationship with Cosmopolitan Interior. Tr. 72. Gordon also testified that Par Wall employees found it difficult to deal with Cosmopolitan Interior, that he entered the paymaster relationship as a limited-time favor for Gold, and that he was making no appreciable profit from the arrangement. Tr. 85, 88. Gordon accordingly testified that he most likely would have terminated Par Wall's relationship with Cosmopolitan Interior in January 2019 even if he had not spoken to anyone from DC 9. Tr. 89.

19.   J.T. Magen subsequently terminated Cosmopolitan Interior from the Aetna job. Tr. 30. While Cosmopolitan Interior had done numerous union jobs for J.T. Magen in the years before this incident, J.T. Magen has not hired Cosmopolitan Interior for union work since terminating Cosmopolitan Interior from the Aetna job. Tr. 35-36; 56-57.

20.   RA Target Painting ("Target") was also among the CBA-signatory companies that Gold approached following the end of Cosmopolitan USA's operations. Radomir Jelcic, the owner of RA Target

Painting, spoke to Gold in November 2018 on multiple occasions, during which conversations Gold asked Jelcic to enter a paymaster relationship to help Cosmopolitan Interior complete an ongoing job.  Tr. 151-152. In this arrangement, Cosmopolitan Interior would reimburse Target for the wages and benefits it would pay to the union painters, plus Cosmopolitan would pay Target 10% on top of labor costs for overhead and an another 10% of labor costs for profit. Tr. 161.

21.  After speaking to Gold but before beginning any relationship with Cosmopolitan, Jelcic spoke to Drew and asked whether Target could act as a subcontractor to Cosmopolitan Interior under the CBA. Drew told Jelcic that Target could act as a subcontractor to any non-union company, including Cosmopolitan Interior, so long as Target adhered to the CBA's requirements. Drew told Jelcic, <u>inter alia</u>, that Target would be responsible for the resulting CBA violation if any non-union painters were caught on the jobsite. Tr. 153.

22.  The first (and only) job Target took on for Cosmopolitan Interior was at 140 Broadway. Tr. 153-154. Jelcic had verified with DC 9 that the two painters Cosmopolitan Interior was supplying were in fact union members. However, when Target's project manager visited the jobsite, he discovered the Cosmopolitan had sent at least two other, non-union painters. Tr. 156-157. After the project manager reported the situation to Jelcic, Jelcic notified Drew that Cosmopolitan Interior had sent non-union painters to the site, rescinded Target's registration of the job, and pulled all the painters off the job. Jelcic subsequently called Gold and terminated Target's

paymaster relationship with Cosmopolitan Interior. Tr. 161-166. Jelcic testified that he was never threated by Drew or anyone else from DC 9. Tr. 159.

23.   At some point following Cosmopolitan USA's closure, Gold approached other painting contractors that were DC 9 CBA signatories about assisting Cosmopolitan Interior with conducting union work. These other companies included JTC Painting and Decorating, Newport Painting and Restoration, and Strauss Painting. Tr. 178. None of these companies agreed to engage in a subcontracting relationship with Cosmopolitan Interior. Tr. 179. In his testimony, Gold said he could not recall whether he had expressly asked these other companies to engage in a formal subcontracting relationship or to act as a paymaster, as Par Wall and Target had done, but it was his intention to set up a similar paymaster relationship. Tr. 333-335. Nor could Gold recall -- and the record does not otherwise establish -- whether Gold's outreach to these companies occurred before or after Par Wall and Target terminated their paymaster relationships with Cosmopolitan Interior. Tr. 327. But if Cosmopolitan Interior had shifted its practice and engaged a third-party union painting company in a formal subcontracting relationship, it would have been less profitable for Cosmopolitan Interior than the arrangements it previously had with Cosmopolitan USA, Par Wall, and Target. The Court infers that Gold did not make a meaningful attempt to enter a formal subcontracting relationship with a union painting contractor after Par Wall terminated

its paymaster relationship. Nor did Gold approach DC 9 about becoming a union signatory himself.

24. In or around the end of January 2019, Gold decided that Cosmopolitan Interior would no longer pursue union painting work, and he directed Cosmopolitan Interior's staff to stop preparing bids for union jobs, leading Cosmopolitan Interior to conduct no union work after Par Wall terminated the paymaster relationship. Cosmopolitan Interior was also unable to supply union labor to subsequent union jobsites for which its bids had been accepted, leading it to cancel ongoing and future jobs. Tr. 129-130. 402.

## III.  Conclusions of Law

Cosmopolitan Interior has brought three claims under 29 U.S.C. § 187(a) alleging that DC 9 engaged in unlawful threats to coerce third-party employers to cease doing business with Cosmopolitan Interior because Cosmopolitan Interior was not a signatory to the DC 9 CBA and to pressure Cosmopolitan Interior to recognize and bargain with DC 9. Among the third parties DC 9 allegedly threatened were Par Wall and Target.

### A. Applicable Law

A section 187 claim has three elements. The first element relates to the union's alleged conduct: "whether the union or its agents engaged in, induced or encouraged a refusal to perform services," which is actionable under 29 U.S.C. § 158(b)(4)(i), or "threatened, coerced or restrained any person," which is actionable under

§ 158(b)(4)(ii). <u>Carrier Air Conditioning Co. v. N.L.R.B.</u>, 547 F.2d 1178, 1189 (2d Cir. 1976).

The second element relates to the union's purpose: "whether an object was to force any person to cease handling the products of, or doing business with, another," <u>id</u>, or if the "[u]nion's objective was preservation of work" or other benefits for the employees of the allegedly threatened company. <u>Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.</u>, 386 U.S. 612, 644 (1967). The Court's inquiry as to this second element must consider all the "surrounding circumstances," which "might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry." <u>Id.</u> at 644 n. 38. As the Supreme Court has explained, "[t]he touchstone is whether [the conduct] is addressed to the labor relations of the [threatened] employer vis-à-vis his own employees" rather than having "the tactical object" of obtaining "benefits to [workers or entities] other than the ... employees of the [threatened] employer, thus making the ... boycott secondary in its aim." <u>Id.</u> at 645.

The third element is "whether the unlawful conduct was a proximate cause of the damage." <u>Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n</u>, 573 F. App'x 66, 67 (2d Cir. 2014); <u>see also</u> 29 U.S.C. § 187(b) (permitting suit by anyone "injured in his business or property by reason o[f]" any unfair labor practice); <u>Feather v. UMW</u>, 711 F.2d 530, 537 (3d Cir. 1983) ("As the words 'by reason of' make

clear, section 303(b) requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff."). "Injury occurs 'by reason of' particular unlawful conduct if such conduct 'materially contributed' to the injury, or was a substantial factor in bringing it about, notwithstanding other factors contributed also." Betal Env't Corp. v. Loc. Union No. 78, Asbestos, Lead & Hazardous Waste Laborers, 162 F. Supp. 2d 246, 255 (S.D.N.Y. 2001), aff'd, 39 F. App'x 688 (2d Cir. 2002).

**B. Par Wall**

The amended complaint alleges that DC 9 illegally threatened Par Wall in or about January 2019 with the purpose of coercing Par Wall to stop serving as paymaster on Cosmopolitan Interior's union jobs. Cosmopolitan Interior further alleges that Par Wall succumbed to those threats, pulled Cosmopolitan's painters off the Aetna job, and terminated its paymaster relationship with Cosmopolitan Interior. This, in turn, allegedly caused Cosmopolitan Interior to be unable to supply union painters to the Aetna job (or any union job), leading the general contractor J.T. Magen to terminate cosmopolitan Interior from the Aetna job and end its pattern of regularly subcontracting union painting work to Cosmopolitan Interior.

In light of the trial record at the time of the instant motion and the findings of fact set forth above, the Court held that Cosmopolitan Interior had failed to prove a claim under 29 U.S.C. § 187 that DC 9 illegally threatened Par Wall for the purpose of coercing Par Wall to cease doing business with Cosmopolitan Interior.

The Court's judgment on partial findings rests on two, independent deficiencies in Cosmopolitan Interior's claim, though additional reasons may arise after all evidence has been submitted.

First, assuming without deciding that DC 9 threatened Par Wall, it did not have an unlawful purpose under section 158(b)(4). Drew, the DC 9 president, intimated to Gordon, Par Wall's principal, that the Union would file a grievance against Par Wall for allegedly violating the DC 9 CBA by serving as a paymaster for Cosmopolitan Interior outside of a formal subcontracting arrangement. It is not an unfair labor practice for a union to threaten to "enforce a [CBA] by taking a grievance to arbitration or by filing a lawsuit for damages." Betal Env't Corp., 162 F. Supp. 2d at 256. Indeed, 29 U.S.C. § 158(e) expressly permits unions in the construction industry to require in their CBAs that any CBA signatory employer subcontract work only to other CBA signatories. The Second Circuit has held, along with the National Labor Relations Board, that "Congress intended that enforcement of such [CBA] provisions may be effected ... through the courts." N.L.R.B. v. Teamsters Local 445, 473, F.2d 249, 253 (2d Cir. 1973); Laborers Int'l Union of N. Am., 318 NLRB 809, 811 (1995).

Here, if Drew and DC 9 threatened to bring grievance charges against Par Wall, that had the "tactical object" of enforcing the terms of the DC 9 CBA, to which Par Wall was a signatory, and addressing the labor relations of the painters employed by Par Wall. Nat'l Woodwork Mfrs. Ass'n, 386 U.S. at 645. The lawfulness of DC 9's action is reinforced by the fact that Drew told Gordon that Par Wall could

continue working for Cosmopolitan Interior, provided the companies entered a formal subcontracting relationship. The clear inference is that Drew's (and by extension DC 9's) object in threatening to bring a grievance was to enforce Par Wall's contractual obligations, not to coerce it to cease working with Cosmopolitan Interior entirely. Even if Gordon interpreted Drew's words as threatening him or his business -- and Gordon credibly insists he did not feel threatened, Tr. 86-87 -- the Court holds that DC 9 did not have an unlawful purpose in seeking to enforce its CBA and so it did not engage in unfair labor practices in the relevant dealings with Par Wall.

Second, even if Drew had threatened Gordon with the purpose of inducing Par Wall to cease doing business with Cosmopolitan Interior, the Court concludes that this was not the proximate cause of Cosmopolitan Interior's alleged damages. The record reflects that Gordon had agreed for Par Wall to serve as Cosmopolitan Interior's "paymaster" only as a favor to Gold, who had previously helped Gordon; that Gordon intended the arrangement to be temporary, to help Cosmopolitan Interior finish union work which it was already contractually bound to perform; that Par Wall made negligible profits from the paymaster arrangement; and that Par Wall's employees had complained that Cosmopolitan Interior was difficult to deal with. Tr. 85-89. When asked whether Gordon would have terminated the paymaster relationship had he never spoken to anyone from DC 9, Gordon said he "most likely" would have. Tr. 89.

Cosmopolitan Interior's theory of damages alleges, in sum, that Par Wall's decision to stop providing paymaster services left it unable to do union work from January of 2019 through 2025. The Court has considered Gordon's testimony about the nature of the business relationship and his intent to assist Gold on a short-term basis, as well as Gordon's statement that he "most likely" would have terminated the relationship even had DC 9 never raised objections to the arrangement. The Court therefore concludes that Cosmopolitan Interior has not proven that Drew's instruction to Gordon to stop acting as paymaster -- while noting that a formal subcontracting relationship would be permissible under the CBA -- did not proximately cause the damages claimed.

The necessary causal inference is further undermined by the evidence demonstrating the limited efforts Gold made to overcome the challenge posed by Par Wall's decision to no longer serve as Cosmopolitan Interior's paymaster on union jobs. DC 9 asserts -- and Cosmopolitan Interior has not meaningfully disputed -- that the CBA prohibits signatories from working as "paymasters." The record contains no evidence the Gold ever attempted to engage a DC 9-affiliated painting company in a formal subcontracting relationship, the type of relationship that the CBA indisputably permitted to Cosmopolitan Interior to enter. But Plaintiff failed to present any evidence that Gold pursued a CBA-compliant subcontracting relationship, let alone that he was stymied by DC 9. Rather, he admitted that his intention was to set up a paymaster relationship

when he approached the only three other unionized painting companies he contacted. Had Gold established a formal subcontracting relationship, there is no evidence that DC 9 would have objected or that Cosmopolitan Interior would have been unable to continue bidding on and performing union work. The Court accordingly concludes that Par Wall's decision to terminate its paymaster relationship did not proximately cause Cosmopolitan Interior to be unable to do union work thereafter, because Gold's apparent unwillingness to engage in CBA-compliant sub-contracting was an intervening cause of Cosmopolitan Interior's inability to perform union work after January 2019.

In sum, the Court holds that Cosmopolitan Interior has failed to prove that DC 9's communications with Gordon and Par Wall amount to an unfair labor practice under 29 U.S.C. § 158(b)(4). Independently, the Court finds that DC 9's engagement with Par Wall did not proximately cause Cosmopolitan Interior's claimed damages, both because Gordon would most likely have terminated the paymaster relationship for other reasons and because there is no evidence that Gold made any significant effort to establish a CBA-compliant subcontracting relationship and instead decided not to bid on union work in the future.

C. **RA Target Painting**

Target is a painting contractor that is a signatory to the DC 9 CBA. Target agreed to serve as a paymaster for Cosmopolitan Interior on a union job in November 2018, after Cosmopolitan USA stopped doing Cosmopolitan Interior's union work. The amended complaint levels

similar allegations to those at issue with Par Wall: that DC 9 threatened Target's owner, Radomir Jelcic, with the purpose of coercing Target to cease doing business with Cosmopolitan Interior. And the allegations fail to state a section 187 claim for similar reasons as those set forth above in connection with the Par Wall allegations.

The record reflects that Target only served as paymaster for Cosmopolitan on one job, at 140 Broadway, because Jelcic terminated the relationship after he learned that Cosmopolitan Interior had sent non-union painters to the jobsite. Plaintiff disputes neither that Cosmopolitan Interior sent non-union painters to the job for which Target was serving as paymaster, nor that the presence of non-union painters on a union jobsite placed Target in violation of its duties under the CBA. Jelcic denied that DC 9 ever threatened him. Rather, he testified that he was upset to learn from his project manager that Cosmopolitan Interior had sent non-union painters, because this violated his understanding of his agreement with Gold, and it could subject Target to a big fine if DC 9 brought a grievance. Jelcic also testified that gaining a reputation for bringing non-union workers to a union jobsite would hurt his standing with DC 9 and its members. Jelcic therefore notified Drew of the situation to avoid risking any blowback from DC 9, pulled the painters off the jobsite, and called Gold to terminate the paymaster arrangement.

The record therefore reflects that Jelcic was neither threatened by Drew nor coerced by DC 9 to cease doing business with Cosmopolitan Interior. Rather, the evidence shows that Cosmopolitan Interior's own

action -- sending non-union painters in violation of the CBA, thereby placing Target at risk for a fine -- caused Jelcic to terminate the paymaster relationship, because Jelcic did not want Target to be held responsible for violating its obligations under the DC 9 CBA. And as explained above, Gold's apparent decision not to enter a formal subcontracting arrangement with another union painting firm and his decision not to bid for any union work after January 2019 are intervening actions that nullify the alleged theory of proximate cause and defeat Plaintiff's claim.

**IV.   <u>Conclusion</u>**

For the reasons set forth above, the Court holds that Plaintiff has failed to prove that DC 9 engaged in illegal secondary activity in their dealings with either Par Wall or Target. Accordingly, the Court granted DC 9's motion for judgment on partial findings with respect to the issues of whether DC 9 is liable under 29 U.S.C. § 187 for allegedly threatening or coercing Par Wall and Target. However, the Court denied the prongs of DC 9's motion related to alleged threats and coercion directed at the New York Stock Exchange and J.T. Magen. <u>See</u> Tr. 473.

While this order resolves the two issues related to Par Wall and Target, it does not dispose of any of Plaintiff's three claims, since none of those claims relies solely on allegations related to Par Wall and/or Target. And as the Court explained on the record, the oral judgment did not preclude Cosmopolitan Interior from questioning the DC 9 witnesses about their dealings with Par Wall and Target or any

other third-party employer to the extent those lines of questioning are relevant to Plaintiff's allegation that DC 9 engaged in a broad-based campaign of intimidation and coercion designed to induce other contractors and clients in the New York City market for unionized construction services to cease working with Cosmopolitan Interior.


     SO ORDERED.

New York, NY
November 15, 2021

JED S. RAKOFF, U.S.D.J.