UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COSMOPOLITAN INTERIOR NY CORPORATION, | |
| Plaintiff, | 19-cv-2669 (JSR) |
| -v- | OPINION AND ORDER |
| DISTRICT COUNCIL 9 INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, | |
| Defendant. | |

JED S. RAKOFF, U.S.D.J.:

This dispute arose from a sight that is not unfamiliar to many New Yorkers: a large, inflatable rat posed outside of an office building, surrounded by union members distributing handbills decrying a tenant or building owner's use of non-union labor. Here, defendant District Council 9 International Union of Painters and Allied Trades ("DC 9" or the "Union") allegedly engaged in unlawful secondary boycotts by arranging such a tableau and utilizing other tactics to apply pressure to the plaintiff, Cosmopolitan Interior NY Corporation ("Cosmopolitan Interior"). Cosmopolitan Interior is a construction subcontractor that provides painting and wall-covering services in commercial spaces throughout New York City. DC 9 represents painters, wallpaper installers, and drywall tapers in the New York City metropolitan area. It is undisputed that DC 9 mounted a concerted campaign against Cosmopolitan Interior, which DC 9 accused of using other unionized companies as "paymasters" to run a so-called "double-

breasted" operation to solicit both union and non-union work, a tactic that the union's collective bargaining agreement purportedly prohibits. The question is whether DC 9's tactics rose to the level of unlawful threats and coercion that caused Cosmopolitan Interior's clients -- general contractors and commercial tenants -- to sever ties with the painting company.

Four days into the bench trial of this case, the Court granted in part and denied in part DC 9's motion for judgment on partial findings under Fed. R. Civ. P. 52(c). As explained in a subsequent memorandum order, the Court held that DC 9 did not engage in unlawful secondary activity with respect to its interactions with two unionized painting companies that briefly served as "paymasters" for Cosmopolitan Interior. See ECF 92. But the Court denied DC 9's Rule 52 motion with respect to the Union's interaction with various clients of Cosmopolitan Interior.

Cosmopolitan Interior's amended complaint brought three counts under 29 U.S.C. § 187 alleging that DC 9 engaged in unlawful secondary activity against Cosmopolitan Interior's business associates. ECF 32 at 8-10. The amended complaint articulates three theories of illegal secondary activity: (i) that DC 9 coerced neutral employers to cease doing business with Cosmopolitan Interior because it was not a signatory to DC 9's collective bargaining agreement ("CBA"); (ii) that DC 9 coerced neutral employers to cease doing business with Cosmopolitan Interior to compel it to recognize DC 9 as the representative of its employees and to bargain with DC 9; and (iii)

that DC 9 encouraged workers employed by other companies to strike or refuse to work with the object of forcing their employers to cease doing business with Cosmopolitan Interior. Id.

Now, having carefully considered the full record of testimony and evidence submitted at trial, as well as the oral and written arguments of counsel, the Court concludes that Cosmopolitan Interior has failed to prove any of its three claims. Accordingly, the Court grants judgment in favor of DC 9.

## I.   Findings of Fact

1.   Cosmopolitan Interior is a construction contractor that was founded in 2013 and has performed painting and wallpapering services. Cosmopolitan Interior is owned by Moishe Gold. Trial Transcript ("Tr.") at 132.[1]

2.   DC 9 is a union representing painters, wallpaper installers, and drywall tapers, among other trades. Its President is John Drew. See Plaintiff's Exhibit ("Pl. Ex.") 4.

3.   DC 9 has entered a CBA with certain painting contractors that, inter alia, sets "area standard" wages and benefits. See, e.g., Pl. Ex. 4. Painting contractors that are party to the CBA must pay at least the area standard wages and benefits to their workers. Under the CBA, a signatory contractor, before starting any job, must file paperwork with DC 9 "registering" the jobsite and must register with

---

[1]   Unless otherwise specified, internal quotation marks, citations, alterations, omissions and emphasis omitted from all sources cited herein.

DC 9 any overtime its painters work. The contractor must further submit payroll information and make contributions to DC 9 benefit funds. Tr. 61-62.

4.   On certain construction sites in New York City, customers and general contractors require that all subcontractors employ union labor and pay area standard wages for each unionized trade. These jobs are referred to as "union jobs" or "union work." See, e.g., Tr. 224; 248-249. The CBA prohibits signatory companies from running a "double breasted" operation, a term which refers to performing both union work at union wages and non-union work at non-union wages, whether under a company's own name or under the name of a separate company owned by an associate. Tr. 479; DX-A at 30-31.

5.   Cosmopolitan Interior was primarily a sales company that would prepare estimates and bid on interior painting projects in and around New York City. Cosmopolitan Interior was not a signatory to the DC 9 CBA. Therefore, Cosmopolitan Interior could not supply its own union labor for union jobs. Tr. 169-170.

6.   When Cosmopolitan Interior was selected for a non-union (i.e., "open shop") job, it would subcontract the work to a non-union painting company. Cosmopolitan Interior subcontracted much of its non-union work to JLM Decorating, Inc., a company that was also owned by Gold and which operates out of the same office space as Cosmopolitan Interior at 111 John Street. Tr. 128, 283, 313, 501. JLM Decorating was not a DC 9 CBA signatory and paid wages and benefits below union scale. Tr. 501-502. During the period 2013-2018, Cosmopolitan Interior

would give its open shop work to JLM Decorating, which would pay painters less than area standard wages and benefits. Tr. 313, 336-338.

7.   Companies that are not signatories to the DC 9 CBA may bid for union work, but the DC 9 CBA requires that the non-union company must engage a subcontractor that is a signatory to the DC 9 CBA. See, e.g., Tr. 248. Under DC 9's interpretation of the CBA, a union subcontractor may supply labor to a non-union contractor, provided that the subcontractor has a contractual relationship with the client contractor and, inter alia, supervises the painters. Tr. 70-71.

8.   From 2013 until late July 2018, Cosmopolitan Interior, when selected for union work, deployed union labor through the auspices of another company, Cosmopolitan Interiors USA Corp. ("Cosmopolitan USA"), which was a signatory to the DC 9 CBA until the summer of 2018. Tr. 135, 297. Cosmopolitan USA was owned by Joel Friedman, and, for at least some portion of the period from 2013 through 2018, Cosmopolitan USA and Cosmopolitan Interior occupied the same office space at 111 John Street in Manhattan, along with JLM Decorating. Cosmopolitan Interior also supplied the materials, supervision, and project management for union jobs for which Cosmopolitan USA registered the jobs with DC 9 and paid the workers. Tr. 306-309.

9.   The evidence showed that Cosmopolitan Interior and Cosmopolitan USA operated as alter egos, and many people, both inside and outside the company, were unaware that they were separate entities or at least unaware of the differences between them. According to Gold, when Friedman formed his company, Friedman and Gold intentionally

chose the name Cosmopolitan USA, very close to the name of Gold's existing company, Cosmopolitan Interior, so that the two companies could work together and customers would not know the difference. Tr. 296-298. Employees testified that they were not aware of the differences between the two Cosmopolitan entities. For instance, a senior project manager who handled union jobs and worked for Cosmopolitan Interior in the 111 John Street office testified that he did not understand what Friedman's function was in the office, and that he was familiar with Cosmopolitan USA only by virtue of his involvement in this lawsuit, and that he "was not privy to any of that at the time" and did not know the difference between the two entities. Tr. 122-123. Specifically, he was not aware that Cosmopolitan USA was registering union jobs with DC 9, and he believed in 2018 and 2019 that Cosmopolitan Interior was a DC 9 CBA signatory. Tr. 123. Similarly, industry veterans who had done business with "Cosmo" for years were not aware that there were multiple entities or that the union painters sent to jobsites on which Cosmopolitan Interior was the subcontractor of record were actually employed by Cosmopolitan USA. See, e.g., Tr. 234 (NYSE). And even though Joel Friedman was not an officer of Cosmopolitan Interior, Tr. 246, he nonetheless would sign contracts on behalf of Cosmopolitan Interior, see PX-23, Tr. 236.

10. At some point before autumn 2018, following several disputes with DC 9 that resulted in DC 9 filing grievances with a Joint Trade Board arbitral panel, Friedman informed Gold that Cosmopolitan USA

would no longer operate. Therefore, Cosmopolitan Interior lost its primary source of subcontracted union labor. Tr. 142, 177-178.

11.  In late 2018, after Cosmopolitan USA was no longer operating, Gold approached other companies that were signatories to the DC 9 CBA, seeking a new subcontracting relationship to enable him to deploy union labor to conduct business union jobsites. Tr. 178.

### A. **Par Wall**

12.  Among the companies Gold approached was Par Wall Finishing, Inc. ("Par Wall"), a drywall taping subcontractor owned by Brian Gordon. Par Wall was a signatory to the DC 9 CBA and employed union drywall tapers, but it did not employ any painters. Tr. 60-61, 82. Starting in or about August 2018, Gold had a series of conversations with Gordon about the possibility of Par Wall acting as the "paymaster" for certain union jobs that Cosmopolitan Interior either had in progress or for which Cosmopolitan Interior's bid had already been selected. Tr. 63-64, 82-83; Ex. 1. In this arrangement, Par Wall would register union jobs with DC 9, perform payroll services for union painters, and make benefits contributions on those painters' behalf. Cosmopolitan Interior would then reimburse Par Wall for the wages and benefits it had paid to the union painters. See, e.g., PX-1. Gordon agreed to this paymaster relationship as a favor to Gold, who had helped Gordon obtain financing some years before. Par Wall made little, if any, profit from this arrangement. Tr. 83-84.

13.  In this "paymaster" arrangement, Par Wall would register each Cosmopolitan Interior jobsite with DC 9. See, e.g., Ex. 2.

Cosmopolitan Interior would then supply union painters, equipment, and materials to the jobsite. Cosmopolitan Interior staff would supervise the painters and provide Par Wall with information on the workers and their hours, which Par Wall would report to DC 9 and use to calculate and pay the workers' wages and benefit contributions in compliance with area standards. Tr. 65, 68, 71, 84-85. Cosmopolitan Interior would then reimburse Par Wall for the labor costs, plus an additional fee of approximately 5-10%, which would cover certain overhead expenses. Tr. 85, 90-91.

14.   After Gordon spoke to Gold but before Gordon began working for Cosmopolitan Interior, Gordon spoke with Drew about whether it would raise any concerns for DC 9 if Par Wall acted as a subcontractor for Cosmopolitan Interior on the in-progress and already awarded union jobs. Drew told Gordon that the CBA permitted Par Wall to work with Cosmopolitan Interior under the terms established by the CBA's subcontracting provisions. Tr. 66-68.

15.   Par Wall acted as paymaster for Cosmopolitan Interior on approximately 15 union jobsites in or about December 2018 and January 2019. Tr. 64. Gordon testified that Par Wall paid the area standard wages and benefits required by the CBA to painters assigned to these projects. Tr. 73.

16.   Among the union jobs for which Par Wall acted as paymaster was a project at 1 Soho Square, 161 Avenue of the Americas, in the offices of the insurance company Aetna. Cosmopolitan Interior had been hired as a subcontractor to do painting and install wall coverings for

this Aetna job by the general contractor J.T. Magen, which had hired Cosmopolitan Interior for between ten and fifteen projects, all of which were union jobs. Tr. 28, 73.

17.   During the time when Par Wall was acting as paymaster for the Aetna project, in or about January 2019, Gordon and Drew spoke again. Drew told Gordon that DC 9 construed the CBA to prohibit the paymaster relationship, in which Par Wall was working on jobsites without a contract with the general contractor or the subcontractor, Cosmopolitan Interior. Tr. 71. In this conversation, Drew intimated that DC 9 would file a grievance under the CBA against Par Wall if it continued acting as Cosmopolitan Interior's paymaster. Tr. 70-71. However, Drew reiterated to Gordon that the DC 9 CBA permitted Par Wall to establish a formal subcontracting relationship with Cosmopolitan Interior and provide union painters to Cosmopolitan Interior on either the Aetna job or any other union job. Tr. 74. Drew never threatened Gordon or Par Wall or suggested that there would be a work stoppage if Par Wall continued doing business with Cosmopolitan Interior. Tr. 86-87.

18.   Shortly after this conversation with Drew, Gordon pulled the painters off the Aetna job and a maintenance job at the New York Stock Exchange (about which more, later), and he terminated Par Wall's paymaster relationship with Cosmopolitan Interior. Tr. 72. Gordon also testified that Par Wall employees found it difficult to deal with Cosmopolitan Interior, that he entered the paymaster relationship as a limited-time favor for Gold, and that he was making no appreciable

profit from the arrangement. Tr. 85, 88. Gordon accordingly testified that he most likely would have terminated Par Wall's relationship with Cosmopolitan Interior in January 2019 even if he had not spoken to anyone from DC 9. Tr. 89.

**B. J.T. Magen**

19.   Cosmopolitan Interior had completed approximately half of its scope of work on the Aetna job when Gordon terminated Par Wall's paymaster relationship. Tr. 29-30. Once Par Wall pulled the job registration, Cosmopolitan Interior was no longer able to supply union painters to the Aetna jobsite at 161 Avenue of the Americas.

20.   J.T. Magen learned of Cosmopolitan Interior's dispute with DC9 when the general contractor's on-site project superintendent became aware that Cosmopolitan was unable to "provid[e] manpower on the job," according to the testimony of James Leo Martin, who has worked as director of construction for J.T. Magen since 2011. Tr. 30, 27. As director of construction, it was Martin's responsibility to assign subcontracted labor on J.T. Magen's jobsites and to prevent any issues that might arise from delaying the projects' schedules. Tr. 26.

21.   Martin was familiar with Cosmopolitan Interior, which had served as the painting subcontractor of record on numerous J.T. Magen union jobs, and on that basis Martin assumed that Cosmopolitan Interiors was a CBA signatory. Tr. 43, 50. Martin was not aware of the existence of Cosmopolitan USA, which was the entity that had supplied all union painters to union jobsites on Cosmopolitan Interior's behalf before summer 2018. Tr. 43. Nor was Martin initially aware that Par

Wall, not Cosmopolitan Interiors, was formally providing the union painters on the Aetna project, even though this may have violated J.T. Magen's insurance requirements for subcontractors. Tr. 44-45, 47. Martin learned that Par Wall was providing painters to the Aetna job from his on-site project superintendent after Par Wall terminated its paymaster relationship with Cosmopolitan Interiors, leaving the Aetna jobsite without the painters needed to finish the work in progress. Tr. 45.

22.   After the dispute between DC 9 and Cosmopolitan Interior had arisen Martin recalls that he received a phone call, on or about January 14, 2019, from DC 9's John Drew about the Aetna project. Tr. 31-32. According to a contemporaneous text message note that Martin sent to his own email, Drew had told Martin that DC 9 would "not allow[] any work to continue." Ex. 14. According to the contemporaneous note, Martin had then texted Moshe Gold, writing that DC 9 was "also not going to allow the glazers and tapers to work alongside of you. This needs to be resolved tomorrow by noon, as I cannot afford to affect move in." Id.; Tr. 32-34. Glazers are skilled tradesmen who install interior glass in offices, and tapers are tradesmen who are involved in finishing drywall partitions during construction of interior walls; both trades are represented by DC 9. Tr. 34. Following his conversation with Drew, Martin understood that DC 9 would not allow the glazers and tapers to work alongside the Cosmopolitan Interior painters at the jobsite, and Martin was concerned that if it

occurred, this would delay the project schedule, for which he was responsible. Tr. 34-35.

23.  Drew says he does not recall speaking with Martin, insisting that "[i]t would have been unlikely" because he "deal[s] with the owners" of general contracting companies. Tr. 485. Drew testified that after he was alerted to issues with the job registered to Par Wall at the Aetna worksite, he contacted Maurice Reagan, the owner of J.T. Magen. Tr. 481-482. Drew testified that he was familiar with Reagan through industry organizations, and that Reagan had told him that if DC 9 had any issues with a J.T. Magen project, Drew should contact him directly. Tr. 483. Drew testified that he told Reagan that Par Wall had registered the job and that neither Cosmopolitan Interior nor Cosmopolitan USA was a signatory to the CBA. Tr. 483-484.

24.  On or about January 16, 2019, J.T. Magen terminated Cosmopolitan Interior from the Aetna job. Tr. 30, 55. Martin, as director of construction, was responsible for making the decision to terminate Cosmopolitan Interior. Tr. 42. Martin testified that he terminated Cosmopolitan Interiors from the Aetna job a few days after its painters stopped showing up because Cosmopolitan Interior's inability to staff the painting job was putting J.T. Magen's project schedule at risk. Tr. 48-49. While Martin was aware at the time that Cosmopolitan Interior's inability to staff the Aetna job was related to an issue it was having with DC9, Martin did not understand the nature of that issue or care about how that labor dispute was resolved. Tr. 49-50. Rather, Martin's concern was about maintaining the staffing

necessary to keep the Aetna project on schedule, and he testified that if Cosmopolitan Interiors had been able to return painters to the jobsite, he would have permitted Cosmopolitan Interiors to continue the work, even if the company had not resolved its disputes with DC9. Tr. 50-51. Gold's testimony corroborated Martin's on this point: Gold recalled Martin telling him that that DC 9 had reached out to him and that he would give Gold a few days to "work around them" and that as long as the work was done in a manner compliant with the union CBA, he was fine with it. Tr. 187.

25.   Cosmopolitan Interior had done numerous union jobs for J.T. Magen in the years before this incident. But J.T. Magen has not hired Cosmopolitan Interior for union work since Martin terminated Cosmopolitan Interior from the Aetna job. Moreover, J.T. Magen stopped considering Cosmopolitan Interiors for union jobs after Moishe Gold informed Martin in late January or February of 2019 that Cosmopolitan Interiors would no longer be bidding on union work, and J.T. Magen subsequently took Cosmopolitan Interior off the bid list for union work. Tr. 35-36; 51-53; 56-57.

C. **New York Stock Exchange**

26.   Cosmopolitan Interior had served as a painting contractor for the New York Stock Exchange ("NYSE") for at least 20 years in 2018, when the events at issue in this lawsuit occurred. Cosmopolitan Interior served as a maintenance painting contractor on renewing 2-3 year contracts. The arrangement required Cosmopolitan Interior to provide an on-site painter 6 days a week after business hours to touch

up paint in high-traffic areas and do other maintenance tasks. By virtue of this relationship, Cosmopolitan Interior was also periodically offered the opportunity to do additional painting work in connection with small renovations and other "one-off" projects. The NYSE did not have any issues with the quality of Cosmopolitan Interior's work or its staffing. Tr. 215-216, 228-229; PX-22.

27.   Sometime between October and December 2018, Gold asked for a meeting with the NYSE to discuss the contract, which had last been renewed in July 2018 and was set to run through December 31, 2020. PX-22 at 1; PX-21; Tr. 218-219. When Gold came to the NYSE for the meeting, he met with the NYSE's director of building operations and facilities, James Katsarelis, and asked to renegotiate the contract for a different set of terms and for more money. Tr. 219. The NYSE representative refused, noting that they could consider renegotiating the terms after the existing contract elapsed. Id.

28.   Drew testified that he was informed by one of DC 9's business representatives that the representative had spoken to a painter sitting outside the NYSE in the fall of 2018, and that the painter identified himself as working in the NYSE and that his employer was Cosmopolitan Interior. Drew then passed on the information to Moises Robalo, DC 9's director of organizing. After later receiving a report from Robalo that Cosmopolitan Interior was not using union work and not paying union wages, Drew testified that he told Robalo to "make sure that he takes the action to protect our area standards," which he explained

meant that they would "inform the public" about situations where workers were being paid less than union scale. Tr. 487-488.

29.   Drew testified that he directed this action based on several sources of information. First, Robalo reported that he sent an organizer to the NYSE to speak to a painter onsite, who told the organizer that he was being paid $25 per hour, which is less than union scale. Second, Drew testified that he had experience with JLM Decorating and Cosmopolitan Interiors and that "from [his] personal experience on job sites [speaking to workers] and [from] dealing with workers who came into the union and produced pay stubs," he came to know that Gold's companies would pay non-union wages to painters and would not pay overtime as required. Third, Drew had staff pull overtime registration data and determined that there was no registered overtime at the NYSE during the relevant period, even though all of the maintenance painting at the NYSE must take place at night. Tr. 485-489, 493-494, 497, 589-590. Drew concluded from this information that the employer of the painters at the NYSE were not DC 9 CBA signatories and that the workers were not paid overtime. Tr. 494.[2]

---

[2] Plaintiff's counsel brought out on cross examination that Drew had testified at his deposition that he did not recall any investigation that was done about Cosmopolitan Interior's alleged history of paying below-area-standards wages before the NYSE handbilling. Tr. 521-522. However, DC 9 was represented by different counsel during discovery, and Drew testified that before his deposition he was not prepared by counsel to discuss the NYSE job or other specific projects at issue, but that his recollection was subsequently refreshed by his preparation to testify at trial with his new counsel and the trial testimony of other witnesses. Tr. 523. Although a factfinder may make adverse credibility determinations where a witness has failed to remember facts at his deposition about which he testifies

30.  Par Wall's Gordon testified that while Par Wall was working as a paymaster for Cosmopolitan Interior, it registered one painter, who was paid union-scale wages and benefits, to work at the NYSE to support Cosmopolitan Interior's maintenance contract. Tr. 72-72. Cosmopolitan Interior relies on this testimony to demonstrate that it was paying union-scale wages and benefits to the NYSE painter during the time relevant to this lawsuit. See ECF 94 at 7-8. However, Cosmopolitan Interior did not offer any documentary evidence, such as payroll records, DC 9 job registration receipts, invoices, written communications, or written agreements supporting Gordon's testimony that Par Wall was serving as paymaster for the NYSE painter. Notably, Cosmopolitan Interior did offer through Gordon a job registration form for work at the Waldorf Astoria hotel that was filed by Par Wall with DC 9 on Cosmopolitan Interior's behalf. PX-2; Tr. 79-80. Moreover, Robalo testified that he reviewed DC 9's job registration records for the 11 Wall Street address used by the NYSE and did not find any registrations by any CBA signatory company covering the relevant dates and times.[3] Tr. 590. Even in the face of Robalo's contradictory

---

at trial, the Court determines that an adverse interest is not justified here, in light of Drew's explanation of the different levels of preparation he received and the emphasis Cosmopolitan Interior placed on the NYSE job.

[3] Although the NYSE uses several addresses and Robalo only testified to checking registrations for the 11 Wall Street address, the Cosmopolitan Interior contracts and other documents related to the NYSE job all reference 11 Wall Street, rather than other addresses. See PX-21 at 1.

testimony, Cosmopolitan Interior did not offer any further evidence that it paid union-scale wages and benefits to the NYSE painter during the relevant time. The Court therefore finds that Cosmopolitan Interior has not proven, even by a preponderance of the evidence, that it paid wages and benefits to the NYSE painter that were at least as great as the DC 9 CBA's area standards during the relevant time.

31.  Per Drew's instructions to verify the facts before acting, Robalo sent a letter to Cosmopolitan Interior by certified mail asking it if disputed the allegation that it was paying wages below area standards at the NYSE. PX-4; Tr. 490. The letter told Cosmopolitan Interior that absent a response, "DC 9 intend[ed] to inform the public of [its] conduct and its impact on [DC 9's] members." Id.

32.  On the morning of December 12, 2018, a large, inflatable rat, sometimes known as "Scabby the Rat," was set up outside the NYSE, and there were two or three representatives of DC 9 standing nearby handing out copies of the following leaflet:





**Cosmopolitan** is performing work at 11 Wall Street NY, NY. Cosmopolitan has a history of not providing their workers the area standard wages and benefits that have been established in this area by District Council NO 9 Painters and Allied Trades. As a result, **Cosmopolitan** destroys the workers' ability to properly care for themselves as well as their families, thereby destroying the Local economy.

**Cosmopolitan** by not paying the area standard in wage and benefits is destroying working class families.

Please help us before it is too late. Let _Cosmopolitan_ know how you feel about this practice.

**Cosmopolitan (212) 586-6438**

We are appealing only to the public, we are not seeking to induce any person to cease work or to refuse to make deliveries.

PX-6. As can be seen, the leaflet states, _inter alia_, that "Cosmopolitan is performing work at 11 Wall Street NY, NY"," which is one of the addresses associated with the NYSE headquarters, and that "Cosmopolitan has a history of not providing their workers the area standard wages and benefits that have been established in this area by District Council NO 9 Painters and Allied Trades." _Id._; Tr. 220-221, 237, 239.

33. None of the DC 9 representatives handing out leaflets was blocking ingress or egress from the NYSE. They were not observed asking others not to work in solidarity with their cause or trying to dissuade

anyone who works for or with the NYSE to refrain from employment or business with the NYSE. Tr. 237.

34.   The NYSE's Katsarelis visited the rat and its minders that morning and obtained one of the leaflets, which he understood to suggest that the below-standard wages and benefits were being paid for the painting work at the NYSE. Katsarelis then went into the building to call Gold. Gold told him that Cosmopolitan Interior was in a dispute with DC 9 over wages and benefits, and he "felt that he was being unfairly asked to pay amounts he didn't believe in." Gold also brought up the previous conversation about renegotiating the contract for better terms. Katsarelis did not ask Gold whether he was paying below-standard wages, because he "wasn't focused on ... what the terms of that dispute [were]. [He] was more focused on trying to get the rat [away from] the building." However, Katsarelis understood from the conversation that Cosmopolitan Interior was a DC 9 CBA signatory. At the time, Katsarelis believed that Cosmopolitan Interior was sending union painters to the NYSE and paying union-scale wages and benefits, because the NYSE has "a practice of hiring union shops and union labor" and had "always thought and believed that Cosmo was a union shop." However, it did not matter to Katsarelis whether Cosmopolitan Interior was a union shop, so long as it supplied painters in compliance with the DC 9 CBA, which was required by the NYSE's contract with Cosmopolitan Interior. Tr. 222-224, 238-240; PX-21 at 8.

35.   Katsarelis then spoke to DC 9's Robalo, whose name and phone number were listed online. Robalo told Katsarelis that the rat was set

up in connection with DC 9's dispute with Cosmopolitan Interior, and that the union placed the rat in front of the NYSE because it is "the biggest name in town" and the action would "draw attention to this dispute." Robalo also suggested that the action would influence Gold or that the NYSE "could try to resolve the situation." Robalo refused Katsarelis's request to move the rat. Robalo did not threaten Katsarelis or the NYSE on the call. Tr. 222-223, 238.

36. Following his conversation with Robalo, Katsarelis spoke to his supervisor and recommended that the NYSE terminate its contract with Cosmopolitan Interior. The supervisor agreed, and the legal department drafted a letter, which was sent around midday, terminating the NYSE's contract with Cosmopolitan Interior effective immediately. After the termination letter was transmitted to and acknowledged by Cosmopolitan Interior via email, Katsarelis forwarded the email chain to Robalo. Katsarelis said that he had not told Robalo that he would terminate Cosmopolitan Interior or that he would send him any information, but Katsarelis "wanted [Robalo] to know that [the NYSE] no longer ha[d] a relationship with Cosmopolitan" so that DC 9 would remove the rat. Tr. 225, 230-231; PX-23; PX-24.

37. The inflatable rat was removed sometime after lunch on December 12, 2018, shortly after the email to Robalo. The NYSE replaced Cosmopolitan Interior with another painting company. Tr. 225, 232, 240.

D. **Other Jobsites**

38.   Before the dispute with DC 9 that gave rise to this lawsuit, Cosmopolitan Interior was regularly retained as a painting subcontractor to perform union work by several repeat clients and general contractors. In connection with the dispute that gave rise to this lawsuit, DC 9 sent a series of letters to general contractors and end-user clients of Cosmopolitan Interior informing them that the company was not a signatory to the DC 9 CBA. See, e.g., PX-16, PX-26, PX-28, PX-29, PX-34. DC 9 also set up an inflatable rat and handed out leaflets outside certain Cosmopolitan Interior worksites. See, e.g., PX-32, PX-33. The record also reflects that DC 9 sent so-called "area standards letters" to Cosmopolitan Interior in connection with these efforts stating that painters were being paid below area standards on various jobsites and asking Cosmopolitan Interior to correct that information if it were inaccurate. See, e.g., PX-31; Tr. 619. Cosmopolitan never responded. Tr. 616. Some of these letters were sent in the summer of 2018, during the period when Cosmopolitan USA was in the process of disaffiliating with DC 9; before that time "there was confusion within the industry of which Cosmopolitan was signatory to DC 9 and which one wasn't," but at that point "there was no Cosmopolitan that was signatory with the district council." Tr. 621.

39.   Among the regular clients targeted by DC 9 was the general contractor Plaza Construction, with whom Cosmopolitan Interior had worked for "many years." In late 2018 or early 2019, Plaza Construction verbally accepted Cosmopolitan Interior's bid of between $150,000-

$200,000 to perform union painting work at the offices of J.P. Morgan Chase at 270 Park Avenue. However, Plaza Construction later declined to consummate the deal with a written agreement and eventually informed Cosmopolitan Interior that the job had gone to another painting subcontractor. The explanation Cosmopolitan Interior received is that it was too "high profile of a job and they needed to give it to somebody else because they didn't want any union issues." Tr. 95-101.

40.   This followed on the heels of correspondence sent over several weeks between Plaza Construction and Cosmopolitan Interior. The email records reflect that on December 18, 2021, DC 9 told Plaza Construction that Cosmopolitan Interior was not a CBA signatory, and Plaza Construction asked a senior project manager at Cosmopolitan Interior to "confirm that your staff on site will be 100% DC9," to which the project manager responded "CONFIRMED." PX-17. However, DC 9 later sent a letter to Plaza Construction, dated January 3, 2019 and signed by Drew, stating: "We would like to advise you that Cosmopolitan USA, Cosmopolitan Interiors, Cosmopolitan Painting & Decorating and all related entities are NOT Signatory with District Council 9." PX-16. In response, on January 7, 2019, the Plaza Construction purchasing manager wrote to Cosmopolitan Interior, noting its receipt of "a letter [from] DC9 stating that Cosmo is not a signatory." PX-17. It continued:

> Unless you can send us something in writing today from DC9 contradicting this we will have to replace Cosmo with another painter. This is a very high profile job for us and we related to all the bidders as was related to us by the client that all subcontractors must be Building Trades Council Union subcontractors. Please understand that we cannot afford to

jeopardize our relationship with the client because of a painting contract on one floor.

Id.

41.   After the dispute with DC 9 arose, Cosmopolitan Interior did not perform any more union work for Plaza Construction, nor for various other repeat clients targeted by DC 9, such as the general contractors Structure Tone, see PX-28; Tishman; and Gilbane, PX-7. Tr. 106-

42.   There were also instances in which DC 9 inflated Scabby the Rat in front of other Cosmopolitan Interior worksites. These included the Long Island offices of the newspaper Newsday, PX-26, PX-29, and the building at 814 Amsterdam Avenue in Manhattan, PX-32. Tr. 104-106, 565.

**E. Cosmopolitan Interior's Other Efforts to Subcontract Painting**

43.   At some point following Cosmopolitan USA's closure, Gold approached other painting contractors that were DC 9 CBA signatories about assisting Cosmopolitan Interior with conducting union work. These other companies included JTC Painting and Decorating, Newport Painting and Restoration, and Strauss Painting. Tr. 178. None of these companies agreed to engage in a subcontracting relationship with Cosmopolitan Interior. Tr. 179. In his testimony, Gold said he could not recall whether he had expressly asked these other companies to engage in a formal subcontracting relationship or to act as a paymaster, as Par Wall and RA Target Painting ("Target") had done, but it was his intention to set up a similar paymaster relationship. Tr. 333-335; see also ECF 92 ¶¶ 20-22 (describing paymaster relationship

with Target). Nor could Gold recall -- and the record does not otherwise establish -- whether Gold's outreach to these companies occurred before or after Par Wall and Target terminated their paymaster relationships with Cosmopolitan Interior. Tr. 327. It is undisputed that if Cosmopolitan Interior had shifted its practice and engaged a third-party union painting company in a formal subcontracting relationship, it would have been less profitable for Cosmopolitan Interior than the arrangements it previously had with Cosmopolitan USA, Par Wall, and Target. The Court finds that Gold did not make a meaningful attempt to enter a formal subcontracting relationship with a union painting contractor after Par Wall terminated its paymaster relationship. Nor did Gold approach DC 9 about becoming a union signatory himself.

44. In or around the end of January 2019, Gold decided that Cosmopolitan Interior would no longer pursue union painting work, and he directed Cosmopolitan Interior's staff to stop preparing bids for union jobs, leading Cosmopolitan Interior to conduct no union work after Par Wall terminated the paymaster relationship. Cosmopolitan Interior was also unable to supply union labor to subsequent union jobsites for which its bids had been accepted, leading it to cancel ongoing and future jobs. Tr. 129-130. 402.

## II. <u>Conclusions of Law</u>

Cosmopolitan Interior has brought three claims under 29 U.S.C. § 187(a) alleging that DC 9 engaged in unlawful threats to coerce third-party employers to cease doing business with Cosmopolitan

Interior because Cosmopolitan Interior was not a signatory to the DC 9 CBA and to pressure Cosmopolitan Interior to recognize and bargain with DC 9. Cosmopolitan Interior alleged that DC 9's pressure campaign targeted two unionized subcontractors that it had used as "paymasters," Par Wall and Target; a general contractor with which it had repeatedly worked, J.T. Magen; and a high-profile client, the NYSE. Cosmopolitan Interior also presented evidence of pressure against other general contractors and clients in connection with the broader allegation that DC 9 blackballed it in the New York City construction industry. As explained above, the Court already concluded in its Memorandum Order dated November 15, 2021 that Cosmopolitan Interior had not carried its burden of proof on its claims with respect to DC 9's conduct directed at Par Wall and Target. <u>See</u> ECF 92. However, for completeness and context, the Court recapitulates its conclusions of law relevant to Par Wall here, because they form the basis of its conclusions as to the other alleged targets of DC 9 pressure campaign.

### A. <u>Applicable Law</u>

A section 187 claim for an unlawful secondary boycott has three elements. The first element relates to the union's alleged conduct: "whether the union or its agents engaged in, induced or encouraged a refusal to perform services," which is actionable under 29 U.S.C. § 158(b)(4)(i), or "threatened, coerced or restrained any person," which is actionable under § 158(b)(4)(ii). <u>Carrier Air Conditioning Co. v. N.L.R.B.</u>, 547 F.2d 1178, 1189 (2d Cir. 1976).

The second element relates to the union's purpose: "whether an object was to force any person to cease handling the products of, or doing business with, another," id, or if the "[u]nion's objective was preservation of work" or other benefits for the employees of the allegedly threatened company. Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 644 (1967). The Court's inquiry as to this second element must consider all the "surrounding circumstances," which "might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry." Id. at 644 n. 38. As the Supreme Court has explained, "[t]he touchstone is whether [the conduct] is addressed to the labor relations of the [threatened] employer vis-à-vis his own employees" rather than having "the tactical object" of obtaining "benefits to [workers or entities] other than the ... employees of the [threatened] employer, thus making the ... boycott secondary in its aim." Id. at 645.

The third element is "whether the unlawful conduct was a proximate cause of the damage." Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n, 573 F. App'x 66, 67 (2d Cir. 2014); see also 29 U.S.C. § 187(b) (permitting suit by anyone "injured in his business or property by reason o[f]" any unfair labor practice); Feather v. UMW, 711 F.2d 530, 537 (3d Cir. 1983) ("As the words 'by reason of' make clear, section 303(b) requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the

plaintiff."). "Injury occurs 'by reason of' particular unlawful conduct if such conduct 'materially contributed' to the injury, or was a substantial factor in bringing it about, notwithstanding other factors contributed also." Betal Env't Corp. v. Loc. Union No. 78, Asbestos, Lead & Hazardous Waste Laborers, 162 F. Supp. 2d 246, 255 (S.D.N.Y. 2001), aff'd, 39 F. App'x 688 (2d Cir. 2002).

    a. Publicity Proviso

The statute also has a carve-out to the prohibition on secondary boycotts that is known as the "publicity proviso." This proviso states:

> [N]othing [in this subsection] shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

29 U.S.C. § 158(b)(4).

Recognizing the important role of the "publicity provisio" in protecting First Amendment activities, the Supreme Court has construed it broadly to protect handbilling. For instance, Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575-78 (1988), narrowly construed the "threaten, coerce, or restrain" element of § 158(b)(4)(ii) not to cover peaceful handbilling in front of a third-party business establishment about a labor dispute with a construction contractor. As the Supreme Court explained:

> The handbills involved here truthfully revealed the existence of a labor dispute and urged potential customers of the mall to follow a wholly legal course of action, namely, not to patronize the retailers doing business in the mall. The handbilling was peaceful. No picketing or patrolling was involved. On its face, this was expressive activity arguing that substandard wages should be opposed by abstaining from shopping in a mall where such wages were paid.

Id. at 575-576. Therefore, "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints. Those words ... are nonspecific, indeed vague, and should be interpreted with caution and not given a broad sweep." Id. at 578.

## B. **Par Wall**

The amended complaint alleges that DC 9 illegally threatened Par Wall in or about January 2019 for the purpose of coercing Par Wall to stop serving as paymaster on Cosmopolitan Interior's union jobs. Cosmopolitan Interior further alleges that Par Wall succumbed to those threats, pulled Cosmopolitan's painters off the Aetna job, and terminated its paymaster relationship with Cosmopolitan Interior. This, in turn, allegedly caused Cosmopolitan Interior to be unable to supply union painters to the Aetna job (or any union job), leading the general contractor J.T. Magen to terminate cosmopolitan Interior from the Aetna job and end its pattern of regularly subcontracting union painting work to Cosmopolitan Interior.

The Court has already held that Cosmopolitan Interior failed to prove a claim under 29 U.S.C. § 187 that DC 9 illegally threatened Par Wall for the purpose of coercing Par Wall to cease doing business with

Cosmopolitan Interior. See ECF 92. As explained in the Court's prior memorandum order, its judgment on partial findings rests on two, independent deficiencies in Cosmopolitan Interior's claim.

First, assuming arguendo that DC 9 threatened Par Wall, it did not have an unlawful purpose under section 158(b)(4). Drew, the DC 9 president, intimated to Gordon, Par Wall's principal, that the Union would file a grievance against Par Wall for allegedly violating the DC 9 CBA by serving as a paymaster for Cosmopolitan Interior outside of a formal subcontracting arrangement. It is not an unfair labor practice for a union to threaten to "enforce a [CBA] by taking a grievance to arbitration or by filing a lawsuit for damages." Betal Env't Corp., 162 F. Supp. 2d at 256. Indeed, 29 U.S.C. § 158(e) expressly permits unions in the construction industry to require in their CBAs that any CBA signatory employer subcontract work only to other CBA signatories. The Second Circuit has held, along with the National Labor Relations Board, that "Congress intended that enforcement of such [CBA] provisions may be effected ... through the courts." N.L.R.B. v. Teamsters Local 445, 473, F.2d 249, 253 (2d Cir. 1973); Laborers Int'l Union of N. Am., 318 NLRB 809, 811 (1995).

Here, if Drew and DC 9 threatened to bring grievance charges against Par Wall, this was for the "tactical object" of enforcing the terms of the DC 9 CBA, to which Par Wall was a signatory, and addressing the labor relations of the painters employed (at least nominally) by Par Wall. Nat'l Woodwork Mfrs. Ass'n, 386 U.S. at 645. The lawfulness of DC 9's action is reinforced by the fact that Drew told Gordon that

Par Wall could continue working for Cosmopolitan Interior, provided the companies entered a formal subcontracting relationship. The clear inference is that Drew's (and by extension DC 9's) object in threatening to bring a grievance was to enforce Par Wall's contractual obligations, not to coerce it to cease working with Cosmopolitan Interior entirely. Even if Gordon interpreted Drew's words as threatening him or his business -- and Gordon credibly insists he did not feel threatened, Tr. 86-87 -- the Court holds that DC 9 did not have an unlawful purpose in seeking to enforce its CBA and so it did not engage in unfair labor practices in its dealings with Par Wall.

Second, even assuming that Drew threatened Gordon to induce Par Wall to cease doing business with Cosmopolitan Interior, those threats were not the proximate cause of Cosmopolitan Interior's alleged damages. The record reflects that Gordon had agreed for Par Wall to serve as Cosmopolitan Interior's "paymaster" only as a favor to Gold, who had previously helped Gordon; that Gordon intended the arrangement to be temporary, to help Cosmopolitan Interior finish union work which it was already contractually bound to perform; that Par Wall made negligible profits from the paymaster arrangement; and that Par Wall's employees had complained that Cosmopolitan Interior was difficult to deal with. Tr. 85-89. When asked whether Gordon would have terminated the paymaster relationship had he never spoken to anyone from DC 9, Gordon said that he "most likely" would have. Tr. 89.

Cosmopolitan Interior's theory of damages alleges, in sum, that Par Wall's decision to stop providing paymaster services left it unable

to do union work from January of 2019 through 2025. The Court credits Gordon's testimony about the nature of the business relationship and his intent to assist Gold on a short-term basis, as well as Gordon's statement that he "most likely" would have terminated the relationship even had DC 9 never raised objections to the arrangement. The Court therefore concludes that Cosmopolitan Interior has not proven that Drew's instruction to Gordon to stop acting as paymaster -- while noting that a formal subcontracting relationship would be permissible under the CBA -- proximately caused the damages claimed.

The necessary causal inference between any DC 9 threat toward Par Wall and Cosmopolitan's alleged damages is further undermined because Gold made very little effort to overcome the challenge posed by Par Wall's decision to no longer serve as Cosmopolitan Interior's paymaster on union jobs. DC 9 asserts -- and Cosmopolitan Interior has not meaningfully disputed -- that the CBA prohibits signatories from working as "paymasters." The record contains no evidence the Gold ever attempted to engage a DC 9-affiliated painting company in a formal subcontracting relationship, the type of relationship that the CBA indisputably permitted to Cosmopolitan Interior to enter and that the evidence demonstrates DC 9 would have accepted. But Plaintiff failed to present any evidence that Gold pursued a CBA-compliant subcontracting relationship with any DC 9 signatory, let alone that he was stymied by DC 9. Rather, he admitted that his intention was to set up a paymaster relationship when he approached the only three other unionized painting companies he contacted. Had Gold established

a formal subcontracting relationship, there is no evidence that DC 9 would have objected or that Cosmopolitan Interior would have been unable to continue bidding on and performing union work. The Court accordingly concludes that Par Wall's decision to terminate its paymaster relationship did not proximately cause Cosmopolitan Interior to be unable to do union work thereafter, because Gold's apparent unwillingness to engage in CBA-compliant sub-contracting was an intervening cause of Cosmopolitan Interior's inability to perform union work after January 2019.

In sum, the Court concluded in its memorandum order that Cosmopolitan Interior failed to prove that DC 9's communications with Gordon and Par Wall amount to an unfair labor practice under 29 U.S.C. § 158(b)(4). Independently, the Court concluded that DC 9's engagement with Par Wall did not proximately cause Cosmopolitan Interior's claimed damages, both because Gordon would most likely have terminated the paymaster relationship for other reasons and because there is no evidence that Gold made any significant effort to establish a CBA-compliant subcontracting relationship and instead decided not to bid on union work in the future.

### C. **J.T. Magen**

Cosmopolitan Interior's strongest evidence in this case is Leo Martin's contemporaneous note about a phone call he received from John Drew. In it, Drew supposedly threatened to have glazers and tapers refuse to work on J.T. Magen's Aetna jobsite alongside Cosmopolitan Interior's workers. While Drew testified that he does not recall the

conversation, other evidence, including Gold's testimony, supports Martin's account. But, in the event, the Court need not determine whether Drew threatened Martin and J.T. Magen, because Cosmopolitan Interior failed to establish the third element, proximate cause, for its secondary boycott claims with respect to J.T. Magen.

Specifically, assuming arguendo that Drew communicated a threat for glazers and tapers to conduct a work stoppage at the Aetna jobsite as a means of pressuring J.T. Magen, and ultimately Cosmopolitan Interior, the Court would still find that any such threat did not proximately cause J.T. Magen to terminate Cosmopolitan Interior from the jobsite. Martin testified that after speaking with Drew, he was focused on Cosmopolitan Interior's inability to staff the worksite with painters, and that he was not concerned about the glazers and tapers compromising the project schedule, because his primary concern was getting painters back on the site. Tr. 55-57. Cosmopolitan Interior's inability to supply union painters to fulfill its commitments to J.T. Magen arose because Par Wall terminated its paymaster relationship, and Gold decided not to enter a formal subcontracting arrangement or otherwise obtain union workers. As explained above, Par Wall's withdrawal from the Aetna job was a consequence of DC 9's lawful exercise of its rights to enforce provisions of the CBA. Martin explained that his decision to terminate Cosmopolitan Interior from the Aetna job "a couple days" after the situation arose was "a direct result of no men -- manpower not coming back on the job site," and that "Mr. Drew had no bearing on the

33

termination of Cosmopolitan." Tr. 35, 55.[4] That J.T. Magen's concern was staffing and protecting the project schedule, rather than mollifying DC 9, is corroborated by Martin's testimony that even if Cosmopolitan Interior did not resolve its issues with the Union but could supply union painters to the worksite, he anticipated that he would be able to speak with Drew and resolve the dispute without DC 9 causing any delay through labor action by glazers and tapers.

Nor did DC 9 engage in any unlawful secondary activity by sending letters to J.T. Magen stating that Cosmopolitan Interior had a history of paying wages and benefits below the CBA area standards. Cosmopolitan Interior argues that DC 9 did "little to no investigation into [its] pay practices," ECF 94 at 5, but this misstates the evidence. Cosmopolitan Interior did not meaningfully contest that it effectively ran a double-breasted operation, working on both union jobs, using union labor supplied by Cosmopolitan USA and then by Par Wall and Target through paymaster arrangements, and non-union jobs. As explained further below, DC 9 provided strong evidence that Cosmopolitan Interior paid wages and benefits below the area standards

---

[4] Cosmopolitan Interior suggests that Martin's testimony on this point is not credible, because he is shaping his testimony to conform to DC 9's wishes to avoid prompting DC 9 from taking any future actions adverse to J.T. Magen's interests. While this could be plausible, Cosmopolitan Interior adduced no evidence to support this inference. Moreover, the Court determines that Martin was a credible witness overall and finds the suggestion that Martin provided inaccurate testimony to be belied by the totality of Martin's testimony, his demeanor, and his willingness to produce Exhibit 14 to Plaintiff's counsel in discovery.

on its open shop work, so the letters truthfully informed J.T. Magen about the labor dispute between DC 9 and Cosmopolitan Interior. As such, they are protected by section 158(b)(4)'s publicity proviso.

The Court therefore concludes that Cosmopolitan Interior failed to prove its secondary boycott claims as related to J.T. Magen because it did not establish the essential element of causality.

### D. **New York Stock Exchange**

There is no evidence that any agent of DC 9 directly threatened the NYSE in connection with its retention of Cosmopolitan Interior. Rather, Cosmopolitan Interior alleges that DC 9 threatened to "besmirch" the reputation of the NYSE by targeting it for rat inflation and hand-billing. ECF 94 at 11. Specifically, Cosmopolitan Interior argues that Robalo's refusal to remove the rat from the vicinity of the NYSE at Katsarelis's request reflects DC 9's allegedly unlawful motive to coerce the NYSE to convince Gold to resolve the dispute on the union's terms or, alternatively, to induce the NYSE to terminate its business relationship with Cosmopolitan Interior.

The evidence clearly shows that DC 9 targeted the NYSE because it was the "biggest show in town" and would want to avoid the negative reputational impact of Scabby the Rat's appearance on its doorstep, by either helping resolve the dispute on DC 9's terms or terminating Cosmopolitan Interior's maintenance contract. See, e.g., Tr. 222. And the evidence shows that the NYSE did in fact terminate Cosmopolitan Interior's contract to avoid reputational damage associated with the rat's presence.

The crucial question, therefore, is whether, in light of the publicity proviso, DC 9's activity outside the NYSE fell outside of the proviso's protection, either because it employed unlawful threats or coercion or because it did not "truthfully advis[e] the public" about DC 9's dispute with Cosmopolitan Interior. 29 U.S.C. § 158(b)(4).

The first way DC 9's actions could be unprotected is if they were coercive or amounted to picketing. The proviso preserves unions' ability to engage in expressive activity and ensures that section 158(b)(4) does not infringe the First Amendment rights of a union or its members. Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. at 575-576. But, as explained above, the proviso excludes from its protection any union activity or picketing that relies on coercion, "confrontation," or "intimidation resulting from the from the physical presence of ... [a] union picket line," rather than persuasion. N. L. R. B. v. United Furniture Workers of Am., AFL-CIO, 337 F.2d 936, 940 (2d Cir. 1964). This distinction is not whether a union placed people in the street or disseminated a message calculated to resonate and drive away customers or business partners. "The loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do." Id. at 580. Rather, what the proviso leaves unprotected is anything that is the "functional equivalent of picketing" in the sense that the demonstration "create[s] a symbolic barrier to those who would enter the [secondary

worksite.]" Sheet Metal Workers' Int'l Ass'n, Loc. 15, AFL-CIO v.
N.L.R.B., 491 F.3d 429, 438 (D.C. Cir. 2007). Courts thus routinely
hold that union demonstrations outside secondary worksites are
protected insofar as they did "not involve patrolling in front of an
entrance way and therefore erect[ed] no symbolic barrier in front of
the [worksite's] doorways," did not "create any physical barrier
blocking the entrances ... or the walkways approaching those
entrances," and did not involve "behavior that could be regarded as
threatening or coercive -- no taunting, no massing of a large number
of people, no following of the [targeted business's] patrons."
Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union
No. 1506, 409 F.3d 1199, 1211 (9th Cir. 2005).

Here, there is absolutely no evidence that DC 9's presence in
front of the NYSE contained any of these features that would make its
activity the "functional equivalent of picketing" by creating a
"symbolic barrier" to entering the NYSE or by using coercive tactics
against staff of or visitors to the NYSE. Sheet Metal Workers' Int'l
Ass'n, Loc. 15, 491 F.3d at 438. At most, DC 9 engaged in so-called
"informational picketing," which includes handbilling and rat
inflation, and such informational picketing is protected as core First
Amendment activity. See, e.g., Betal Env't Corp., 162 F. Supp. 2d at
256; Chefs' Warehouse, Inc. v. Wiley, 2019 WL 4640208 (S.D.N.Y. Sept.
24, 2019); Microtech Contracting Corp. v. Mason Tenders Dist. Council
of Greater New York, 55 F. Supp. 3d 381, 384 (E.D.N.Y. 2014) (Bianco,
J.) ("It is abundantly clear that [a union] has a constitutional right

to use an inflatable rat to publicize a labor dispute."); <u>see also</u> <u>Int'l Union of Operating Engineers (Lippert Components, Inc.)</u>, 371 NLRB No. 8 (July 21, 2021) (holding that display of a 12-foot inflatable rat near the entrance of a protected site is not unlawful).

The second way DC 9's actions at the NYSE might be unprotected would be if the message it was disseminating was not "truthfully advising the public" about its dispute with Cosmopolitan Interior. 29 U.S.C. § 158(b)(4). But the Court concludes that the handbills are not actionable in this respect.

To start, the handbills did not make any specific claim about Cosmopolitan Interior's relationship to the NYSE other than the undisputed fact that the company was "performing work at 11 Wall Street." <u>See</u> ¶ 32, <u>supra</u>. The handbill continued by stating that "Cosmopolitan has a history of not providing their workers the area standard wages and benefits ... established ... by [DC 9]," and arguing that this harms workers and the local economy. <u>Id.</u> Cosmopolitan Interior has not proven that this statement is misleading, let alone that it is false: Cosmopolitan Interior admits that it performed open-shop work and did not pay union-scale wages and benefits on those jobs.[5] This "history" of paying wages and benefits below the area standards was also well-known to Drew and Robalo from their knowledge

---

[5] Cosmopolitan Interior's argument that work performed by JLM Decorating is irrelevant to its own history is belied by the record. Gold testified that Cosmopolitan Interior gave its nonunion work to JLM Decorating during the period 2013-2018. Tr. 313, 336-337.

of the industry and from talking with and reviewing documents provided by Cosmopolitan Interior painters over the years. The Court accordingly concludes that the handbills were "truthfully advising the public" about DC 9's dispute with Cosmopolitan Interior.

But, as Katsarelis testified, the handbill distributed at the NYSE could be read to imply, even though it does not directly state, that Cosmopolitan Interior was paying wages and benefits below the area standards to its painters stationed at the NYSE. See Tr. 223. Cosmopolitan Interior asserts that it was paying area standard wages to its painter at the NYSE, via its paymaster relationship with Par Wall, so that it would be misleading to suggest that it was paying non-union wages and benefits at the NYSE. See Tr. 72-73. But even assuming that the handbills could be understood to imply the message Cosmopolitan Interior suggests, there is inadequate proof that this message was misleading: Cosmopolitan Interior did not prove that it in fact was paying area standard wages and benefits to the NYSE painter during the relevant period. See ¶ 30, supra.

Furthermore, even assuming arguendo that Cosmopolitan Interior did pay area standard wages and benefits and that the handbills should be understood to suggest otherwise, it would still fail to establish that the handbills are actionable. The Supreme Court and the courts of appeals have broadly construed the publicity proviso as a matter of constitutional avoidance, because to do otherwise would unduly constrain the First Amendment rights of labor unions and their members to free expression on issues of public concern. Fla. Gulf Coast, 485

U.S. at 575-576 (holding that union handbills were due First Amendment protection, and were not commercial speech, because "they pressed the benefits of unionism to the community and the dangers of inadequate wages to the economy and the standard of living of the populace"). In the libel context, for instance, the First Amendment protects speakers on matters of public concern from liability without proof that they intentionally or recklessly published materially false, defamatory information. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 756 (1985) (citing Gertz v. Robert Welch, Inc. 418 U.S. 323 (1974)). The NLRB has consistently applied a similar rule to the publicity proviso: "the proviso does not require that a handbiller be an insurer that the content of the handbill is 100 percent correct, and ... where, as here, there is no evidence of an intent to deceive and there has not been a substantial departure from fact, the requirements of the proviso are met." Teamsters (Ind.) Loc. 537 (Lohman Sales Co.), 132 NLRB 901, 906 (1961); see also In Re United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506, 355 NLRB 797, 811 (2010) (relying on Gertz and rejecting argument that purported false or misleading statements on union banners vitiate the publicity proviso protection because there was no "subjective intent to deceive").

Cosmopolitan Interior impliedly concedes that some degree of culpability is required to exempt a handbill from the publicity proviso's protection, and it suggests, without citing any authority, that DC 9 was under a duty to conduct an "investigation" of its pay practices at the NYSE before distributing the handbills. This

proposition is questionable at best, since the Seventh Circuit has affirmed a judgment for a union in a secondary boycott case even though the defendant union "conducted no actual investigation into plaintiff's wages, fringe benefits, or other conditions of employment." Helgesen v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Loc. Union 498, 548 F.2d 175, 178 (7th Cir. 1977). But even assuming that the Union was under such a duty, Cosmopolitan Interior did not prove that the Union lacked a good faith basis to make the statements in the handbills it distributed. Drew and Robalo testified that their conclusions were based on their long-term experience in the industry and had spoken with and reviewed pay records for painters who worked for Cosmopolitan Interior and other companies owned by Gold, as well as conversations with the NYSE painter and a review of job registration records. That alone would provide a good faith basis to distribute the handbills. But DC 9 also sent an area standards letter to Cosmopolitan Interior and received no response.[6] Cosmopolitan Interior provides no rationale or authority for requiring DC 9 to have done any more.

The Court therefore concludes that DC 9's actions related to the NYSE did not amount to unlawful secondary activity.

---

[6] There was some dispute at trial about whether Gold or Cosmopolitan Interior received the area standards letter, but the Court need not resolve this factual issue, since its conclusions would not be affected either way.

### E. <u>Other Industry Participants</u>

Cosmopolitan Interior also alleges that DC 9 unlawfully threatened and coerced various other general contractors and clients to stop doing business with it, resulting in Cosmopolitan Interior being generally blackballed from the market for union painting work. As explained in the findings of fact set forth above, DC 9's alleged misconduct includes the same tactics used in connection with J.T. Magen and the NYSE: letters informing counterparties that Cosmopolitan Interior was not a signatory to the DC 9 CBA and public displays outside of worksites featuring inflated rats and handbills. <u>See</u> ¶¶ 38-42, <u>supra</u>.

For the reasons explained above in connection with the NYSE, the Court concludes that none of these tactics, whether considered individually or collectively, adequately supports Cosmopolitan Interior's claims for illegal secondary activity. The publicity proviso specifically permits unions to engage in "publicity ... for the purpose of truthfully advising the public, including consumers..., that a product or products are produced by an employer with whom the labor organization has a primary dispute." 29 U.S.C. § 158(b)(4). As Cosmopolitan Interior's project manager testified, Cosmopolitan Interior considers both general contractors and end users to be its customers, Tr. 106, or, in the proviso's terminology, the "consumers" of its painting and wall covering services, 29 U.S.C. § 158(b)(4). And there is no evidence in the record that any of DC 9's actions constituted "picketing" or otherwise exceeded the publicity proviso's

protections for peaceful expressive activity. See Fla. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. at 575–78. The evidence therefore shows that DC 9 only "attempt[ed] to persuade customers" of Cosmopolitan Interior not to employ its services; there is no evidence of coercion. Id. 578.

Cosmopolitan Interior also failed to prove that any of DC 9's handbills or other public statements were untruthful, so as to escape the publicity proviso's protection on that basis. The record reflects that Cosmopolitan Interior's double-breasted business model, which admittedly included non-union work performed in part by painters employed by JLM Decorating, meant that it was not untruthful for DC 9's handbills to state that the company had a "history" of paying wages and benefits below the area standards set by DC 9's CBA. See, e.g., PX-32, PX-33. And even assuming arguendo that the context of the handbills' distribution outside of specific worksites resulted in the reasonable reader understanding the handbills to suggest that Cosmopolitan Interior was paying wages and benefits below the area standards on the particular worksites, plaintiff never presented evidence that Cosmopolitan Interior had provided union labor or paid area standard wages and benefits on the particular worksites targeted by DC 9.

Finally, as explained above, the evidence does not support Cosmopolitan Interior's allegation that DC 9 blackballed it from the market for union work. Rather, Cosmopolitan Interior's failure to secure any union work after January 2019 was proximately caused by

Gold's decision to no longer bid for union work and his failure to pursue any of the available avenues for securing union labor to staff union jobsites.

Accordingly, the Court concludes that Cosmopolitan Interior failed to prove its case with respect to DC 9's broader pressure campaign against general contractors and end-user clients.

## III. Conclusion

For the reasons set forth above, the Court holds that plaintiff Cosmopolitan Interior has failed to prove that DC 9 engaged in illegal secondary activity as related to any of the targets of DC 9's pressure campaign. The Court therefore enters judgment in favor of DC 9 on all three claims.

The Clerk is respectfully directed to enter final judgment in favor of defendant DC 9 on all outstanding claims, thereby dismissing the case in its entirety, and to close the case.

SO ORDERED.

New York, NY
April 25, 2022

_____
JED S. RAKOFF, U.S.D.J.